**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ALLIANZ LIFE INSURANCE COMPANY OF AMERICA, | : : : | Civil Action No. 08-668 (SDW) (MCA) |
| Plaintiff, | : : | **OPINION** |
| v. | : : | March 5, 2012 |
| THE ESTATE OF AUSTIN BLEICH, CANDICE EDELBAUM BLEICH, | : : : | |
| Defendants. | : : | |

**WIGENTON**, District Judge.

Before the Court is Plaintiff/Counterdefendant Allianz Life Insurance Company of America's ("Allianz" or "Plaintiff") Motion for Summary Judgment and Defendants/Counterclaimants the Estate of Austin Bleich and Candice Edelbaum Bleich's ("Edelbaum" or "Defendants") Cross-Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c). This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). Venue is proper pursuant to 28 U.S.C. § 1391. These Motions are decided without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons stated below, this Court grants Plaintiff's Motion for Summary Judgment and denies Defendants' Cross-Motion for Summary Judgment.

**FACTUAL AND PROCEDURAL HISTORY**

**1. The Application**

On September 30, 2005, Austin Bleich ("Decedent" or "Bleich") executed an application seeking a life insurance policy, policy number 60012691, with Allianz for $2,000,000 at the elite select non-tobacco rate (the "policy"). (Rath Aff. Ex. A, at 6; Del Mauro Supplemental

1

Certification ("Suppl. Certif.") Ex. C, Pfluger Dep. 105:11-15, 105:21-23.)   The application comprised of four parts: Part I (an initial application), Part II (Answers to Medical Examiner), a telephone application, and an Amendment to Application (the "Amendment").

In completing Part I of the application, Decedent responded to questions about his medical history.  Bleich indicated that he had never received treatment or advice from a member of the medical profession for heart disease, kidney or liver disease, a stroke, dizziness, nervous or mental disorder, cancer, or a tumor.  (Rath Aff. Ex. A, at 5.)   Decedent also stated that he had not been hospitalized or advised by a member of the medical profession that he needed hospitalization, a surgical procedure, or a diagnostic test within the past twelve months.    (Id.) Thereafter, Decedent signed and acknowledged the "Agreement and permission" portion of the application which provides in relevant part:

> I understand that the complete application consists of my written answers to the questions in this application and my answers to the questions in the subsequent phone application.  Further, I agree to answer the questions in the subsequent phone application completely and truthfully.  I am aware that the Company will rely on these answers and that if my answers are not complete and true, my policy may not be valid.  I will review my phone application and notify the Company of any discrepancies.

(Id. at 6.)

On October 17, 2005, Bleich completed Part II of the application.  (Rath Aff.  Ex. B.) Decedent provided the following answers:

> Have you ever had or been told you had or consulted a physician or practitioner for:
>
> G.     Ulcers, colitis, jaundice, hernia, any disease of the gastrointestinal system including the stomach, intestines, liver, gall bladder, pancreas or esophagus?
>             YES [Hernia about four years ago]
>
> . . . .
> L.       Cancer, tumor, or growth of any kind?

2

YES [Basal Cancer]

. . . .

Have you ever had or been advised to have any surgical operation,
treatment or test; are you using any medication or drugs?
                NO
Have you ever had an X-ray, electrocardiogram, or other medical
test?
                YES [Dr. Leonard Raifman ("Dr. Raifman") for a general
check up]
Have you within the last ten years:
A.      Had any illness, disease, or injury that is not included in
your other answers?
                NO
B.      Consulted or been examined or treated by any physician or
practitioner not named in connection with your other answers?
                NO

(Id.)

        Subsequently, on October 19, 2005, Decedent orally completed the phone application

portion of the application.  (Rath Aff. Ex. C, at 1; Rath Aff. ¶ 14.)  Bleich indicated that his

personal physician was Dr. Raifman, his last visit with Dr. Raifman was nine months ago, the

"current status of th[e] visit: (i.e. all test results, normal, complete recovery, still on meds)" was

"normal results," and there were no referrals.  (Rath Aff. Ex. C, at 1-2.)  Decedent also stated

that he had undergone a colonoscopy and hernia surgery within the past five years.  (Id. at 3-5.)

However, he provided that within the past five years he had not: (1) had any diagnostic test

including but not limited to imaging, EKG, or laboratory tests; (2) been advised to have a

surgical operation; and (3) received medical advice, and treatment had not been recommended or

received for any disease or abnormality of the pancreas, cancer or tumor, or any disease or

abnormality of the stomach.  (Id. at 5-6, 8-9, 12.)

        Decedent elaborated on the questions he answered in the affirmative and stated that he

was treated for a colonoscopy two years ago with "good results-no polyps removed," (id. at 4);

3

he had hernia surgery four years ago with "good results," (id. at 5); and he was diagnosed with basal cell carcinoma but it was removed from his back within the last five years and his follow up results were "good."  (Id. at 11-12.)

Pursuant to the "Permission and agreement" provision in Part I of the application giving Allianz the right to "make necessary changes in th[e] application," (Rath Aff. Ex. A, at 6), Allianz amended the amount of the policy from $2,000,000 to $1,300,000, specified the amount of the monthly premium, and changed the rate class from "elite select non-tobacco" to "super select non-tobacco."  (Rath Aff. Ex. E, at 3; Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 105:11-15, 105:21-23; Rath Supplemental Aff. ¶ 16.)  Thereafter, on November 15, 2005, Allianz issued Bleich a policy for $1,300,000 at the "super select non-tobacco" rate, one down from the elite rate he applied for.  (Rath Aff. Ex. E, at 3; Zelman Decl. Ex. A, Webb Dep. 143: 5-7.)

Consequently, on November 22, 2005, Decedent executed an Amendment to Application ("Amendment") to reflect the changes Allianz made.  (Rath Aff. Ex. D.)  The Amendment stated: "This amendment is to form a part of said application and a copy attached to the policy . . ."  (Id.)  It also provided:

> Since the date of the original application of this policy, the proposed insured(s) and any family members proposed for insurance in the application: . . . (c) have not suffered an illness or an injury; and (d) have not consulted or been examined by a physician or practitioner[.]

(Id.)  Bleich signed and acknowledged the above provisions in the Amendment.

On that same day, Decedent executed the telephone application.  (Rath Aff. Ex. C, at 23-24.)  Furthermore, on that day, Decedent tendered a check for $578.95 made payable to Allianz for the insurance premium and the policy was delivered to Decedent.  (Zelman Decl. Ex. A, Webb Dep.154:1-8, 167:14-25; Rath Aff. Exs. F, G.)  Hence, although the policy was issued on

November 15, 2005, it did not become effective until November 22, 2005 because Bleich acknowledged and "agree[d]" in Part I of the application that any policy issued "as a result of this application shall be considered in force only when, during my lifetime and continued insurability, a policy is issued by the Company, said policy is received and accepted by me, and the first premium has been paid." (Rath Aff. Ex. A, at 6.)

### 2. Decedent's Medical History

Bleich visited Dr. Raifman on October 20, 2005 because he was "having some stomach issues" and he felt he had an ulcer caused by H. pylori.[1] (Zelman Decl. Ex. G, Raifman Dep.15:25, 20:16-24, 24:9-10.) Consequently, Decedent requested triple therapy for gastritis. (Id. at 21:2-4.) Additionally, Dr. Raifman prescribed Decedent Prevacid, Flagyl, and Biaxin. However, subsequent testing revealed that Decedent did not have H. Pylori. (Id. at 25:2-5.) As a result, on October 23, 2005, Dr. Raifman suggested that Decedent undergo an endoscopy ("EGD"). (Id. at 25:7-10.)

On October 26, 2005, Decedent's EGD report "showed the hiatus hernia and gastritis and that the duodenum was normal." (Id. at 27:24-28:4.) Nonetheless, Decedent still complained of having an extended abdomen, bloating and abdominal discomfort. (Id. at 28:16-18.) On October 28, 2005, Beth Israel Medical Center prepared a Pathology Consultation Report which indicated that Decedent "had chronic inflammation—actually gastric mucosa without significant changes." (Id. at 29:4-6, 32:5-7.) According to Dr. Raifman, "this result was actually better than what was indicated on the endoscopy." (Id. at 32:7-9.)

---

[1] Helicobacter pylori or H. pylori "is a spiral-shaped bacterium commonly found in the stomach." WebMD, http://www.webmd.com/digestive-disorders/h-pylori-helicobacter-pylori (last visited Feb. 8, 2012).

On November 2, 2005, Decedent underwent an abdominal/bladder sonogram.   (Id. at 33:3-8; Rath Aff. Ex. I, at 1.)  According to Dr. Raifman, the results of the sonogram indicated that there was "a concern" that Decedent had pancreatic cancer.  (Zelman Decl. Ex. G, Raifman Dep. 33:17-21; see also Rath Aff. Ex. I, at 2.)

As a result, on November 4, 2005, Dr. Raifman conducted a blood test and a CA 19-9 test, a marker for pancreatic cancer.  (Zelman Decl. Ex. G, Raifman Dep. 31:5-7, 34:9-14.)  Dr. Raifman testified the results for the CA 19-9 test were "very elevated[,]" indicating "a suspicion that a patient has pancreatic cancer[.]"   (Id. at 34:15-19.)  According to Dr. Raifman, he told Decedent he was "worried about something" and referred Decedent for imaging study reports to rule out neoplasm of the pancreas.  (Id. at 35:3-8.)

Consequently, on November 7, 2005, Bleich underwent a CAT scan of his abdomen and pelvis.  (Id. at 35:18-20.)  The report showed that Decedent "most likely [had] [] pancreatic cancer that was involving the circulatory system in the body of the pancreas."   (Id. at 36:8-10; see also Rath Aff. Ex. K, at 1-2.)  Dr. Raifman testified that at this juncture he would have told Bleich that his pancreas was abnormal and that he was suffering from an illness more serious than gastritis.  (Zelman Decl. Ex. G, Raifman Dep. 39:17-23, 40:24-41:3.)  Furthermore, Dr. Raifman stated that he told Decedent that he "was worried about a significant problem in the pancreas."   (Id. at 39:11-12.)   Subsequently, on November 8, 2005, Dr. Raifman referred Decedent to Dr. Franklin Kasmin ("Dr. Kasmin") for an Endoscopic Retograde Cholangiopancreatography and on November 10, 2005, he referred Decedent Dr. Michael Leitman ("Dr. Leitman") for a biopsy.  (Id. at 37:2-8, 37:21-23, 39:24-40:3.)

On November 8, 2005, Bleich visited Dr. Kasmin.  Dr. Kasmin testified that he typically discussed every aspect of Decedent's condition and treatment with Decedent. (Zelman Decl. Ex.

6

N, Kasmin Dep. 22:1-7, 28:12-17, 33:10-25, 58:8-16.)   Subsequent to the visit, Dr. Kasmin

wrote to Dr. Raifman stating: "I saw Mr. Bleich in consultation and we discussed endoscopic

ultrasound and biopsy of his pancreatic mass.  We also discussed chemotherapy and radiation

versus surgery in situations where the lesion may not be immediately amenable to resection."

(Rath Aff. Ex. L.)

On November 11, 2005, Decedent asked Dr. Raifman to send the results of his blood test,

ultrasound and CAT scan to Dr. Fong at Sloane-Kettering so that he could set up an appointment.

(Rath Aff. Ex. M.)  Later that day, Bleich and his wife consulted with Dr. Leitman.  After Dr.

Leitman reviewed the diagnostic tests he had received from Dr. Raifman, he advised Decedent

and his wife that Decedent may have pancreatic neoplasm.  (Zelman Decl. Ex. Q, Leitman Dep.

20:10-23, 31:17-24, 35:20-25.)  In addition, he informed the couple that if it was an operable

lesion, he would recommend the Whipple procedure.  (Id. at 36:6-9.)  Furthermore, Dr. Leitman

discussed the risks of the operation with Decedent.  (Id. at 37:10-12.)  Dr. Leitman wrote a letter

to Dr. Raifman relaying the same information he told Bleich.  (Rath Aff.  Ex. N.)

On November 14, 2005, Bleich underwent an endoscopic ultrasound ("EUS") with Dr.

Kasmin.  (Rath Aff. Ex. O.)  The next day, Dr. Kasmin advised Dr. Raifman of the results of the

EUS as follows: "The neck of the pancreas was diffusely hypoechoic, consistent with a mass."

(Rath Aff. Ex. P.)  The results of a subsequent CAT Scan of Decedent's abdomen on November

18, 2005 showed the following: "[m]ass at the pancreatic body and neck with vascular

encasement . . . .   Findings are most consistent with neoplasm, presumably pancreatic

adenocarcinoma[,]" or in other words pancreatic cancer.  (Rath Aff. Ex. Q, at 3; Zelman Decl.

Ex. G, Raifman Dep. 53:16-22.)

On December 8, 2005, Decedent underwent a fine needle aspiration. The cytopathologic diagnosis revealed that "malignant cells were found and the diagnosis was poorly differentiated adenocarcinoma with dense fibrous collagenous tissue." (Zelman Decl. Ex. G, Raifman Dep. 55:20-24; Rath Aff. Ex. S, at 1.)  Decedent died on September 21, 2007 of pancreatic cancer. (Rath Aff. Ex. H, at 6.)

**3. Allianz's Response to Bleich's Death**

On October 7, 2007, Candace Bleich, Decedent's wife and one of the named beneficiaries on the policy, executed a life claim form to Allianz. (Zelman Dec. Ex. O.)  The life claim form listed cancer as the cause of death. (Id.)

On January 31, 2008, Julie Klieve, Allianz's Claim Consultant, sent Candace Bleich a letter denying her claim and rescinding the policy because Decedent failed to disclose material information pertaining to his medical history in his responses to the insurance application. (Rath Aff. Ex. V.)  In addition to the letter, Allianz issued her a check in the amount of $13,315.85 representing a refund of the premiums Decedent paid. (Rath Aff. Ex. W.)

On February 5, 2008, Allianz commenced this action in New Jersey seeking to rescind, *ab initio,* the life insurance policy it issued to Decedent under N.J. Stat. Ann. § 17:33A-4. (Am. Compl. ¶¶ 56.)  Allianz alleges that Decedent made material misstatements of facts, failed to disclose material facts in response to questions on the insurance applications, failed, refused, and omitted to disclose and inform Allianz of health changes during the underwriting of the life insurance policy which made Decedent uninsurable on the date the policy was issued, received, and accepted. (Id. ¶¶ 35, 44, 50.)

On March 12, 2008, Defendants filed a complaint against Allianz in the United States District Court for the Southern District of New York ("SDNY") alleging that Allianz breached

its contract with Decedent by failing to honor the terms of the policy (the "SDNY action").  On May 14, 2008, Defendants filed a motion to dismiss and/or transfer pursuant Plaintiff's action to the SDNY.  (Docket Entry No. 6).  On November 6, 2008, this Court denied Defendants motion. (Docket Entry Nos. 12, 13). Subsequently, the SDNY granted Plaintiff's motion to transfer the SDNY action to this District.  On February 13, 2009, this Court entered an order consolidating the SDNY action with this action.  (Docket Entry No. 16).

**SUMMARY JUDGEMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations,

unsupported assertions or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325).  Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case."  Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law.  Celotex Corp., 477 U.S. at 322-23.

## DISCUSSION

Allianz maintains that it is entitled to summary judgment and the policy should be rescinded *ab initio* because Decedent failed to: (1) disclose material facts during his application for the policy; (2) inform Allianz of material changes in his health during the underwriting period; and (3) satisfy the condition precedents set forth in the policy.  On the other hand, Defendants argue that summary judgment should not be granted to Plaintiff because: (1) Plaintiff's claims are barred by the two-year incontestability provision; (2) there are factual disputes; (3) Plaintiff's claims are based on inadmissible evidence; (4) Plaintiff was aware

Decedent was undergoing additional medical care but failed to conduct a proper investigation of Decedent's health; and (5) Decedent's misrepresentations, if any, are not material.  Additionally, Defendants claim they are entitled to summary judgment because: (1) Allianz's claims are based on alleged inadmissible misstatements; (2) under the "Entire Contract" provision included in the policy, Decedent's failure to disclose several doctors' visits that occurred between the date he signed Part I of the application, September 30, 2005, and the date the policy was issued but before it became effective, November 15, 2005, is not a basis for recission; and (3) Allianz did not rely on Decedent's misrepresentations because it conducted an independent investigation. (Defs.' Br. 1-2.)

### 1.  Whether Allianz's claims are barred by the Incontestability Statute

Edelbaum maintains that Allianz's claims are barred by the statutory two-year incontestability provision in N.J. Stat. Ann. § 17B:25-4 because Allianz initiated this action in February 2008, more than two years after the date the policy was issued, and Decedent's death "prior to the expiration of the contestability period is irrelevant." (Defs.' Opp'n Br. 33, 39.)  The Statute does not support Defendants' position.  N.J. Stat. Ann. § 17B:25-4 provides in relevant part: "There shall be a provision that the policy . . . shall be incontestable, except for nonpayment, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue."  The policy Allianz issued Decedent contained a contestability clause with language similar to that of the statute.  It provided in relevant part: "After this policy and any attached Riders or Endorsements have been <u>in effect during the Insured's lifetime for a period of two years from the Policy Date</u> . . . this policy shall become incontestable as to a misstatement made in the application . . . ." (Rath Aff. Ex. E, at 7) (emphasis added).  One court interpreting the statute held as follows:

> The plain meaning of N.J.S.A. § 17B:25-4 requires an insured to survive for two years, while the policy is in force, before the policy becomes incontestable. This reading is supported by case law consistently holding that 'during the lifetime of the insured' language requires survival of the statutory period. <u>If an insured dies before the policy has been in force two years, the incontestability clause is a nullity and the insured is not bound by the two year limitation</u>.

<u>Spilker v. William Penn Life Ins. Co.</u>, 251 N.J. Super. 480, 486 (App. Div. 1991) (emphasis added); <u>see also</u> <u>Formosa v. Equitable Life Assurance Soc.</u>, 166 N.J. Super. 8, 13-14 (App. Div. 1979), <u>certif. denied</u>, 81 N.J. 53 (1979) (concluding that the insurance company's rescission claim was not barred because the insured died before the expiration of the two-year incontestability period).

Even Defendants' expert, Richard Pfluger ("Pfluger"), does not support Defendants' position that Decedent's death during the contestability period is irrelevant for purposes of determining whether Allianz's claims are barred. Pfluger testified that he understood the contestability clause to mean that "[i]f someone dies within the contestability period, two years, and there's something in the application that is untruthful or incorrect, a material mistatement, then [Allianz] can rescind coverage." (Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 85:23-86:2.)

In the instant action, the policy was issued on November 15, 2005. Decedent died on September 21, 2007. Therefore, Decedent did not survive the two-year incontestability period. As a result, Allianz's claims are not barred.

**2. Equitable Fraud**

Allianz's claim for rescission is based on N.J. Stat. Ann. § 17B:24-3(d), which provides: "The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer." To establish a claim for

equitable fraud, Allianz must demonstrate that the application for insurance contained misrepresentations and those misrepresentations "materially affected either the acceptance of the risk or the hazard assumed by the insurer."   N.J. Stat. Ann. § 17B:24-3(d); <u>TIG Ins. Co. v. Privilege Care Mktg., Inc.</u>, Civ. A. No. 03-03747, 2005 U.S. Dist. LEXIS 7428, at *17 (D.N.J. Apr. 27, 2005).   According to the New Jersey Supreme Court, "[e]ven an innocent misrepresentation can constitute equitable fraud justifying recission."   <u>Ledley v. William Penn Life Ins. Co.</u>, 138 N.J. 627, 635 (1995).  Consequently, contrary to Defendants' position, (Defs.' Opp'n Br. 15, 18), the statute "does not require proof of an actual intent to deceive." <u>Mass. Mut. Life Ins. Co. v. Manzo</u>, 122 N.J. 104, 114 (1991).  The Court next determines whether Bleich made misrepresentations in the application.

      a.  <u>Misrepresentation</u>

In determining whether Bleich made a misrepresentation, this Court must first consider whether the misrepresentation was in response to a subjective or objective question on the application. <u>Formosa</u>, 166 N.J. Super. at 18.  A question is objective if it "call[s] for information within the applicant's knowledge, 'such as whether the applicant has been examined or treated by a physician.'" <u>Ledley</u>, 138 N.J. at 636 (quoting <u>Formosa</u>, 166 N.J. Super. at 15).  Conversely, subjective questions "seek to probe the applicant's state of mind." <u>Formosa</u>, 166 N.J. Super. at 15.  Thus, "[c]ourts have been more lenient when reviewing an applicant's misrepresentation made in response to a subjective question than to an objective question." <u>Ledley</u>, 138 N.J. at 636.  Consequently, "[w]hen a question is unambiguous and calls for a statement of fact, misrepresentation or concealment is inexcusable." <u>Id.</u> at 637.  The questions in the insurance application concerning Bleich's diagnostic tests, medical treatments, and various doctors' visits and consults are objective questions.

Edelbaum does not dispute that Decedent failed to disclose to Allianz that he visited several doctors and underwent various tests and procedures after he completed the oral telephone application.   Nonetheless, Defendants argue that Allianz cannot demonstrate that Decedent misrepresented information on his application.  Defendants base this, and many other arguments, on their position that the telephone application and the Amendment are inadmissible under N.J. Stat. Ann. § 17B:24-3(a) because they were not attached to the policy when it was issued. (Defs.' Opp'n Br. 15-16.)  Therefore, as an initial matter, this Court must determine whether the the telephone application and Amendment are admissible.

i.   <u>Admissibility of the telephone application and Amendment</u>

The statute provides: "No application for any life or health insurance policy or annuity contract shall be admissible in evidence in any action relative to such policy or contract, unless a copy of the application was attached to or endorsed upon the policy or contract when issued." N.J. Stat. Ann. § 17B:24-3(a).  An Oregon court interpreting a statute[2] similar to N.J. Stat. Ann. § 17B:24-3(a) explained:

> "[A]ttached to" or "indorsed upon" are alternative paths to the same statutory ends—i.e., an insurer can avoid coverage based on misrepresentations in an application if <u>either is satisfied</u>.  Thus, just as the former permits such evidence in circumstances where the policyholder is "provided with everything the insurer relies on in issuing the policy," the same is true of the latter.

---

[2] The statute provides, in relevant part:

(1)  All statements and descriptions in any application for an insurance policy by or in behalf of the insured, shall be deemed to be representations and not warranties.   Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless the misrepresentations, omissions, concealments of fact and incorrect statements:

(a)  Are contained in a written application for the insurance policy, and a copy of the application is indorsed upon or attached to the insurance policy when issued[.]

Or. Rev. Stat. § 742.013 (2009).

Brock v. State Farm Mut. Auto. Ins. Co., 98 P.3d 759, 764 (Or. Ct. App. 2004) (internal citation omitted) (emphasis added).

The parties do not dispute that the policy was issued on November 15, 2005.  Allianz's "Application Assembly" procedure requires amendments and copies of the application to be stapled and inserted in the folder containing the policy before it is issued and delivered to the insured.  (Fenske Aff. Ex. A.)  LaRita Fenske ("Fenske"), Senior Operations Manager of the Life Case Management at Allianz testified that Allianz requires strict compliance with the procedures set forth in the Application Assembly.  (Fenske Aff. ¶¶ 4-5.)  Fenske also testified that when Bleich's policy was issued on November 15, 2005, it contained the bound Parts I and II of the application, the unsigned telephone application and the unsigned Amendment.  (Id. ¶ 6.)  Furthermore, the "Entire Contract" provision in the policy states that "[a] copy of the application is attached and is a part of this policy."  (Rath Aff. Ex. E, at 8.)  Other than Defendants' bare assertions, they have not provided any evidence to demonstrate that the telephone application and Amendment were not attached to the policy when it was issued.  Edelbaum's burden at this stage requires "more than just bare assertions, conclusory allegations or suspicions."  Podobnik, 409 F.3d at 594 (internal quotation marks omitted).

Defendants make much ado about the fact that the telephone application and Amendment were unsigned when the policy was issued on November 15, 2005.  Edelbaum's contention that the application must be signed and attached to the policy at the time of issuance is not supported by the plain language of N.J. Stat. Ann. § 17B:24-3(a).  The statute provides that a copy of the application either be endorsed upon or attached to the policy at the time of issuance. N.J. Stat. Ann. § 17B:24-3(a).  It does not require that both be done.  Id.; see also Brock, 98 P.3d at 764. Also, as the court pointed out in Brock, "indorsement, like attachment, requires the insurer, in

15

issuing the policy, to reproduce information concurrently with the issuance of the policy so that the policyholder is fully and precisely apprised of the information that the insurer relies on in issuing the policy." 98 P.3d at 764 (internal quotation marks and citation omitted); see also Evans v. United Health Life & Accident Ins. Co., 871 F.2d 466, 471 (4th Cir. 1989) (noting that the insurer is required to "attach the information it relied on in issuing insurance to the policy"). Therefore, Edelbaum's contention that Plaintiff could not have relied on the unsigned documents, (Defs.' Br. 20), lacks merit.

Moreover, Defendants' position renders the language in the attached telephone application and Amendment requiring Decedent to disclose any changes in his medical history superfluous. A basic principle of contract interpretation is that "a contract should not be given an interpretation which renders a term or terms superfluous or meaningless." Penske Logistics, Inc. v. KLLM, Inc., 285 F. Supp. 2d 468, 474 (D.N.J. 2003); see also J. Josephson Inc. v. Crum & Forster Ins. Co., 293 N.J. Super. 170, 216 (App. Div. 1996) ("Equally fundamental is the principle that an insurance contract must be interpreted by considering the agreement as a whole, and whenever possible, meaning must be given to all of its parts.").

Nonetheless, Defendants, relying on Evans, maintain that N.J. Stat. Ann. § 17B:24-3(a) required that the telephone application and Amendment be signed in order to be admissible. Defendants' reliance on Evans, is misplaced. In Evans, the insured completed and signed a life insurance application for Volunteer State Life Insurance Company ("Volunteer") in the summer of 1985. In completing the application, the insured misrepresented that he had not used tobacco in any form within the past twelve months. On October 1, 1985, Volunteer approved the insured for a $500,000 policy. Subsequently, the insurance agent, without having the insured complete or sign an application for United States Life & Accident Insurance Company ("United"), asked

16

United to review the insured's application.  On October 21, 2005, United approved the insured

for a $500,000 policy basing its decision on the information the insured provided in the

Volunteer application.  After it approved the policy, United created an application for the insured

by transcribing information from the Volunteer application onto a United application.  Neither

application was attached to the Volunteer or United policy, which had an "issue date" of

November 10, 1985.  On January 3, 1986, the insured delivered two copies of the transcribed

United application with the policies.  The Volunteer application was not included.  After the

insured's death, the beneficiary filed a claim for death benefits with United.   United denied the

claim on the basis that the insured had made a material misrepresentation that he was a

nonsmoker.  871 F.2d at 467-68.  Consequently, the insured commenced suit.  At issue was

whether the district court erred in admitting the insurance application into evidence and central to

that determination was resolving when the policy was issued.  Id. at 469.

The statute in Evans, like N.J. Stat. Ann. § 17B:24-3(a), provided that only statements

contained in a written application that is "'endorsed upon or attached to the policy when issued'"

may be used as a basis for rescission.  Evans, 871 F.2d at 469 (quoting Va. Code Ann. § 38.1-

393, repealed by Va. Code Ann. § 38.2-100 et seq.).  The Fourth Circuit concluded that the

district court erred in admitting the United application because it was not signed or attached to

the policy at the time it was issued.  Id. at 469-472.

In addition, the facts in Evans are markedly different from the facts in this case.  In

Evans, the Fourth Circuit noted that "[t]here is no dispute that on [the date the policy was

issued], the United policy did not have attached a copy of either the Volunteer or the United

application."  Id. at 470.  In contrast, here, Allianz has provided evidence that Parts I and II of

the application, as well as the telephone application and Amendment were attached to the policy

17

at the date of issue.  (See Fenske Aff. ¶¶ 4-6.)  As stated earlier, Defendants have not come forth with any competent evidence to dispute Allianz's assertions.  Moreover, in Evans the court engaged in an extensive discussion of the "issue date" although it was disputed that the insured had not signed the Union application.  If Evans stood for the proposition that the application had to be signed and attached to the policy, as Defendants claim, the court's discussion of the policy's issue date would have been gratuitous because the fact that the Union application was not signed would have made it unnecessary for the court to determine when the policy was issued.

Furthermore, neither New York Life Ins. Co. v. Rosso, 154 Miss. 196 (1929) nor Wheelock v. Home Life Ins. Co., 115 Minn. 177 (1911) support Defendants' contention that the telephone application and Amendment had to be signed and attached to the policy in order to be admissible.  The statutes in both cases, like N.J. Stat. Ann. § 17B:24-3(a) and the statute in Evans, required that the basis for rescission be contained in a written application and that the application be either endorsed upon or attached to the policy when issued.  Consequently, the Rosso and Wheelock Courts found that representations in the part of the application which was neither endorsed upon nor attached to the policy at the time it was delivered could not be a basis for recission.  Neither court interpreted the statutes to require that the application be both endorsed upon and attached to the policy at the time of issuance in order to be admissible.

Contrary to Edelbaum's position, Blatz v. Travelers  Ins. Co., 68 N.Y.S.2d 801 (N.Y. App. Div. 1947), does not suggest that an unsigned application that is attached to the policy at the date of issue is inadmissible.  (Defs.' Reply Br. 7-8.)  In Blatz, although the insured had signed the rider to the policy, the copy of the rider was not signed and the rider was not attached to the policy when it was issued.  Id. at 804, 805.  The statute in question, like N.J. Stat. Ann. §

17B:24-3(a), "require[d] that a copy [] be indorsed or attached to the policy." Id. at 806. The insurer argued that it had complied with the statute because it delivered the unsigned copy to the insured two days after the policy was delivered. Id. at 805-06. The court rejected the insurer's argument because it had failed to endorse the copy or attach the copy to the policy. Id. at 806. Allianz's actions are consistent N.J. Stat. Ann. § 17B:24-3(a)'s requirements and Blatz.

Similarly, Sandberg v. Metro. Life Ins. Co., 342 Pa. 326 (1941) does not support Defendants' position. In that case, the statute in question provided:

> All insurance policies issued . . . in which the application of the insured . . . form part of the policy or contract between the parties thereto, or have any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant, . . . and, unless so attached and accompanying the policy, no such application . . . shall be received in evidence in any controversy between the parties to, or interested in, the policy . . . .

The Act of May 17, 1921, Pub. L. No. 682 § 318 (emphasis added). Unlike that statute, N.J. Stat. Ann. § 17B:24-3(a) does not contain language requiring that the application be signed and attached to the policy at the time it is issued. See N.J. Stat. Ann. § 17B:24-3(a). The statute only requires that "a copy of the application [be] attached to or endorsed upon the policy or contract when issued." Id. (emphasis added). Consequently, this Court concludes that the telephone application and Amendment are admissible and Bleich's misrepresentation in either document is a basis to void the policy.

Furthermore, Defendants' argument that the telephone application and Amendment are not admissible under the "Entire Contract" provision in the policy lacks merit. (Defs.' Reply Br. 12.) In Part I of the application, Decedent acknowledged that he "underst[oo]d that the complete application consists of [his] answers to the questions in this telephone application and [his] written answers to the questions in the initial application." (Rath Aff. Ex. C, at 23-24.) Also, the

"Entire Contract" provision in the policy specifically stated that the application, which includes the Amendment, was part of the Entire Contract.  (Rath Aff. Ex. E, at 8.)  Even, Defendants' expert admitted that the Amendment was part of the insurance application.  (Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 137:17-20.)  Thus, the policy's "Entire Contnract" provision does not preclude the admission of the telephone application and Amendment.

ii.   <u>Whether Bleich made misrepresentations in the application</u>

A review of the record clearly shows that when Decedent executed the telephone application and Amendment on November 22, 2005, he failed to disclose to Allianz the various doctors' visits, tests and procedures he underwent.  Significantly, in executing the Amendment, Decedent misrepresented that he had "not consulted or been examined by a physician or practitioner" since he completed Part I of the application on September 30, 2005.  (Rath Aff. Ex. D; Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 142:18-143:3.)

Defendants contend that Decedent was not required to advise Allianz of any changes in his medical history on November 22, 2005, when he executed the telephone application.  (Defs.' Br. 24.)   According to Edelbaum, pursuant to the certification attached to the telephone application, Decedent was only obligated to affirm that the responses he provided on November 15, 2005, were truthful.  Defendants base their argument on this language they purport accompanied the telephone interview: "I hereby declare that, to the best of my knowledge and belief, the information given above is correctly recorded, comp[l]ete and true, and I agree that the Company believing it to be true shall rely and act upon it accordingly."  (<u>Id.</u>)  Yet, the actual language in the certification does not limit Decedent's obligation to provide accurate responses to the day the telephone application was recorded.  The provision required Bleich to

> review the information [he] provided [Allianz] in th[e] Telephone
> Application very carefully.  If any of the information is not correct,

20

> please advise the company immediately.  If you do not advise the
> company of any incorrect information within the 30 day right to
> return period stated on the front page of your policy, the accuracy
> of the information you provided us will be deemed affirmed by
> you.

(Rath Aff.  Ex. C, at 23; Zelman Decl. Ex. E, at 23.)  There is no "relate[] back" language, as

Edelbaum suggests.  (See Defs.' Br. 24.)  Hence, Bleich was under an obligation to advise

Allianz, within thirty days, of any incorrect information he provided in the telephone application.

Nonetheless, he executed the telephone application on November 22, 2005, without disclosing

that he had consulted several doctors and undergone various diagnostic tests about a pancreatic

mass.

Even if the telephone application contained a relation back provision, like Defendants

suggest, Bleich was still obligated to disclose the doctors' visits under the provisions in the

Amendment, which was part of the application and was attached to the policy when it was

issued.  The Amendment specifically required Decedent to disclose if "[s]ince the date of the

original application of this policy, . . . [he had] been examined by a physician or practitioner."

(Rath Aff. Ex. D.)

Next, the Court determines whether Bleich's misrepresentation was material.

    b.   Materiality

A misrepresentation is material "as a matter of law where knowledge of the truth would

naturally influence the judgment of the insurer in making the contract, estimating the risk, or

fixing the premium."  Parker Precision Prods. Co. v. Metro. Life Ins. Co., 407 F.2d 1070, 1073

(3d Cir. 1969).  In Gallagher v. New England Mut. Life Ins. Co., 19 N.J. 14, 20-21 (1955), the

New Jersey Supreme Court stated:

> The prior medical history of an applicant is naturally and logically
> a most material matter to a life insurance company which has been

> asked to underwrite a death risk, and the working rule is that
> inquiries propounded in the application form, and the truthfulness
> and completeness of answers thereto touching the physical
> condition and pathological history of the applicant, are material to
> the risk as a matter of law and such materiality is not the subject of
> a finding of fact by a jury.

Allianz contends that it would have denied Decedent's application for insurance if Decedent had disclosed his various doctors' visits, tests and procedures.  (Rath Aff. ¶ 31.) Defendants' expert also admitted that Allianz was still in the process of underwriting Decedent's policy as of November 2, 2005, and "that [a] diagnostic impression of pancreatic neoplasm was highly significant to the underwriters at Allianz who were evaluating [Decedent's] policy."  (Del Mauro Supp. Certf. Ex. C, Pfluger Dep. 162:11-14, 175:12-16.)  Pfluger also testified that Decedent's medical condition overall was material to Allianz's decision to "accept the risk, reject the risk, issue the policy and fix the premium rate."  (Id. at 84:9-14.)  Furthermore, he stated that the multiple doctor consultations and diagnostic testing Bleich underwent relating to the presence of a pancreatic mass including Dr. Leitman's discussions with Decedent about the course of treatment would have been "material" and "critical" to Allianz's underwriters.  (Id. at 179:6-13, 184:13-21.)

Nonetheless, Defendants maintain that Decedent's misrepresentations were not material because Dr. Abe Elson ("Dr. Elson"), Allianz's physician, examined Decedent, and Allianz conducted an independent investigation and was therefore aware that Decedent required further testing.  (Defs.' Br. 30; Defs.' Opp'n Br. 23.)  Edelbaum's argument lacks merit because neither the results of Dr. Elson's examination nor Dr. Raifman's records would have disclosed that Decedent misrepresented information on the insurance application.

In Gallagher, the court identified the unequal positions the insurer and the insured occupy when it comes to information about the insured's general health.  The court noted:

22

> It is [the insured] and he alone who has the necessary complete knowledge of [all] facts [relating to his general health], and his statements and answers in the application are the determinant qualitative factor in the equation of insurability which the insurer has to resolve before issuing a policy. <u>It is only when the independent investigation of the company discloses sufficient facts to seriously impair the value of this determinant factor that a further duty rests upon the insurer to investigate the statements and admissions in the application.</u>

<u>Gallagher</u>, 19 N.J. at 22 (emphasis added).  Stated differently,

> The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry.

<u>Golden v. Nw. Mut. Life Ins. Co.</u>, 229 N.J. Super. 405, 415 (App. Div. 1988).  Therefore, "an insurer's duty to investigate is limited."  <u>Ledly</u>, 138 N.J. at 639.

Dr. Elson examined Decedent on October 17, 2005. (Rath Supplement Aff. Ex. A, at 1.) During that examination, Decedent did not complain that he suffered from abdominal pains or that he had been treated for abdominal discomfort or pain.  (Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 193:4-12.)   Moreover, Dr. Elson did not "find any evidence of past or present disease of [the] [s]tomach or other [a]bdominal [o]rgans."  (Rath Supplemental Aff. Ex. A, at 4.) At the conclusion of the examination Dr. Elson noted that Decedent "appears to be in excellent health."  (<u>Id.</u> at 1-3; Zelman Decl. Ex. C, Elson Dep. 23:11-14.)   None of the information ascertained from Dr. Elson's examination contradicted the answers Decedent provided in Part I of the insurance application.

Moreover, the Medical Information Bureau's ("MIB") responses Allianz received on October 18, 2005, would not have triggered Allianz's duty to conduct further investigation. (Rath Suppl. Aff. Ex. B).  The MIB showed a "160GEB" code for June 8, 2004, which means

that Bleich suffered from basal cell carcinoma "within 1-2 years of June 8, 2004" and a "Life Insurance Direct-14AP04" code, which means that Decedent applied for insurance with another company on April 4, 2004.  (Id.; Rath Suppl. Aff. ¶ 9.)  The information Plaintiff received from the MIB is consistent with the responses Decedent provided in Parts I and II of his application.

Subsequently, on October 25, 2005, Allianz received Dr. Raifman's records on Bleich.  (Defs.' Br. 30.)  However, Dr. Raifman's records did not contain any information that would have "seriously impaired" the answers Decedent provided on Parts I and II of the application or the oral telephone application, prior to its execution.  Gallagher, 192 N.J. at 22.  Dr. Raifman's report indicated that on October 23, 2005, he had recommended that Decedent undergo an EGD.  (Zelman Decl. Ex. H.)  As Defendants point out, an abnormal EGD result is an indication for a variety of conditions, one of which is cancer or tumors.  (Zelman Dec. Ex. F, at 2.)  An abnormal EGD may also be the result of conditions Bleich previously suffered or believed he suffered:  hiatal hernia, ulcers and gastritis.  (Id.; Zelman Decl. Ex. G, Raifman Dep.15:25, 20:16-24, 21:2-4, 24:9-10.)  Moreover, the EGD results showed that "the duodenum was normal."  (Zelman Decl. Ex. F, at 2; Zelman Decl. Ex. G, Raifman Dep. 27:24-28:4.)  Consequently, contrary to Edelbaum's position, Dr. Raifman's records would not have made Allianz aware that Decedent required further testing.  Furthermore, neither the recommendation of an EGD nor the results of the EGD would have given Plaintiff a basis to conduct an additional investigation because they did not contradict Decedent's representations on the insurance application.

Nonetheless, Edelbaum, relying on Golden and Park v. Equitable Life Assurance Soc'y, Civ. A. No. 90-5800, 1992 U.S. Dist. LEXIS 19244 (E.D. Pa. 1992), maintains that Allianz had a duty to investigate.  This case is distinguishable from Golden and Park.  In Golden, the insured represented that he had never been treated for diabetes.  229 N.J. Super. at 408.  Subsequently,

24

the insurer conducted an independent investigation by obtaining the insured's prior history from the MIB and the insured's primary physician.  Id. at 409.  Specifically, the insurer inquired from the insured's physician if the insured had "ever been diagnosed a diabetic or had a blood sugar problem[.]"  Id.  The insured's physician responded that he had no information about the insurance company's request and he had never treated the insured for diabetes.  Id. at 410.  The insurance company then requested additional information from the MIB.  The MIB provided that the insured had "been told [] that he was a potential diabetic."  Id. at 410-11.  Notwithstanding the insurance company's knowledge of the above information, it issued a policy to the insured.  Id. at 411.  The court concluded that the question of whether the insurance company was obligated to conduct further investigation was a question of fact for the jury.  Id. at 418.  Similarly, in Park, although the insured represented that he did not smoke, the insurance company's independent laboratory examination found evidence of nicotine in the insured's urine.  1992 U.S. Dist. LEXIS 19244 at *9.  The court, applying New Jersey law, found that the question of whether the insurer had a duty to conduct an independent investigation was for the jury.  Id.

Allianz's investigation did not reveal any information that was inconsistent with the responses Bleich provided in his application or hinted that Decedent may be suffering from pancreatic cancer.  While Edelbaum's expert concluded that Allianz should have "asked for additional information about the medical condition from the attending physician before making a decision about issuing the policy," (Zelman Decl. Ex. L, at 3), he conceded that Dr. Raifman's report only indicated that Decedent was being treated for peptic ulcer.  (Del Mauro Supp. Certif. Ex. C, Pfluger Dep. 159:12-15.)  However, a report showing that Decedent was being treated for peptic ulcer does not trigger Allianz's limited duty to investigate for the reasons stated above.

Defendants also rely on <u>Simpson v. Widger</u>, 311 N.J. Super. 379 (App. Div. 1998), for the position that Plaintiff is not entitled to summary judgment.  <u>Simpson</u> is inapplicable to this case.  In <u>Simpson</u>, the plaintiff purchased a horse from the defendant.  Four years later, the plaintiff filed a claim under Article 2 of the Uniform Commercial Code, N.J. Stat. Ann. § 12A:1-101 <u>et seq.</u>, based on the breach of the defendant's express warranty that the horse was sound. <u>Id.</u> at 382.  The plaintiff maintained that the defendant made this assertion even though the doctor the plaintiff hired to conduct an independent investigation told the defendant that the horse's x-rays showed some "remodeling."  <u>Id.</u> at 384.  The Appellate Division affirmed the trial court's grant of summary judgment because the plaintiff conducted an independent investigation and knew the results of that investigation.  <u>Id.</u> at 392-94.  <u>Simpson</u> is inapplicable because the issue before the court was not an insurer's duty to conduct an independent investigation.[3]

## **CONCLUSION**

For the reasons stated above, Allianz's Motion for Summary Judgment is GRANTED and Edelbaum's Cross-Motion for Summary Judgment is DENIED.

s/ Susan D. Wigenton, U.S.D.J.

cc:      Magistrate Judge Madeline C. Arleo

---

[3] In light of this Court's conclusion that Allianz has established a claim for rescission under N.J. Stat. Ann. § 17B:24-3(d), it will not address Allianz's other bases for rescission; namely: Decedent's failure to abide by his common law duty to disclose and Decedent's failure to satisfy the condition precedent provision in the policy. Additionally, because Plaintiff has prevailed on its equitable fraud claim, Defendants have no basis to assert counterclaims for breach of contract, unconscionable business practice and breach of good faith.  (Defs.' Am. Answer and Countercl. ¶¶ 3-28.)  Consequently, Edelbaum's counterclaims are dismissed.